UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S LONDON AND CERTAIN INSURANCE COMPANIES, *et al*, <br><br> Plaintiffs, <br> VS. <br><br> CAMERON INTERNATIONAL CORPORATION, *et al*, <br><br> Defendants. | § § § § § § § § § § § § § CIVIL ACTION NO. 4:14-CV-2105 |

## MEMORANDUM OPINION AND ORDER

**I.   INTRODUCTION**

Before the Court is the defendant's, Axon, motion for summary judgment [DE 159], and the plaintiffs', Underwriters, response [DE 425].[1] The Court, after a complete and proper review of Axon's motion, Underwriters' response, the arguments and supporting documents presented and all memoranda on file, determines that Axon's motion for summary judgment should be granted, pursuant to 28 U.S.C. § 2201 of the Federal Rules of Civil Procedure.

**II.   FACTUAL BACKGROUND AND SUMMARY CONCLUSIONS**

The factual background giving rise to this suit has been stated previously and will not be restated at this time. Suffice it to say, for purposes of this motion, Underwriters filed this suit as subrogee of plaintiffs, Walter, Tana and Helis, as a result of well blowout on the Hercules 265 on July 23, 2013, off the coast of Louisiana in the Gulf of Mexico. At the time, Hercules was responsible for the crew and operations although under the supervision of Walter, pursuant to an

---

[1] In previously filed Memoranda, the Court addressed the parties by their full names. *See* [DE#s 413, 420]. Therefore the Court will not again introduce all plaintiffs, defendants and/or third-parties. However, the Court incorporates by reference all previously filed Memoranda by reference as if fully stated herein.

1 / 18

Offshore Drilling Contract ("ODC") between the two. It is that ODC and its legal interpretation that is the subject of this motion. *See* [DE 249, Attachment 1].

In previous Memoranda, the Court held that Walter is contractually obligated to indemnify Hercules under the terms of the ODC. *See* [DE 413 Memorandum, pp. 3, 4]. Relying on the terms of the ODC, the Court held that "Walter [was] obligated to indemnify and hold harmless Hercules and its affiliates . . . [its] contractors and subcontractors". *Id.* By its motion for summary judgment, Axon raises the question of whether Axon is a contractor or subcontractor under the terms of the ODC and, therefore, entitled to indemnity. Alternatively, Axon raises a question concerning the standard of proof applicable to Underwriters strict liability claims against Axon in this case -- is it a "but for" standard or a "substantial factor" standard. The Court is of the opinion that Axon is entitled to subcontractor status under the terms of the ODC. Therefore, the Court need not address the question of which standard of proof applies. In addition, assuming that previous memoranda and orders already entered by the Court have not addressed the affidavit(s) of various witnesses, the Court STRIKES them as untimely and determines that the SEMS Report[2] of findings is unimpeached.

The Court also determines that the findings and conclusions of the BSEE Panel Report are consistent with those in the SEMS Report and together support the conclusion that the BOP[3], including the blind shear ram, was overwhelmed by the ineptitude of Walter personnel that resulted in the blowout and the erosion of the surfaces in the BOP making it impossible to obtain

---

[2] Pursuant to federal regulations, Walter commissioned an investigation into the cause and effect of the July 23, 2013, well blowout on the Hercules 265. That investigation was called a Safety Environmental Management Systems Accident Investigation Report ("SEMS"). In addition to the SEMS Report, the Bureau of Safety and Environmental Enforcement ("BSEE") also convened a panel to investigate and report its findings and conclusions. Both Reports are discussed/presented in this Memorandum.

[3] Underwriters' suit focuses on the failure of the "blowout preventer" ("BOP") parts and supplies provided to the Hercules 265 by Axon.

and maintain proper seal in the BOP. The Court's reasoning and conclusions rely, for the most part, on the SEMS and BSEE Reports and the testimony of Walter's on site personnel.

## III. CONTENTIONS AND ASSERTIONS OF THE PARTIES

### A. *Underwriters' Contentions/Assertions*

Underwriters asserts that the blowout preventer ("BOP") specifically the blind shear rams, on which Axon performed repair work, failed to properly close and thereby stop the well blowout on July 13, 2013. In this regard, Underwriters contends that the work and/or parts installed were inferior and as a result the BOP failed to accomplish its intended purpose.

Underwriters' suit is based on claims of strict liability, relying on Louisiana Product Liability Act. *See* [LA. Rev. Stat. Ann. § 9:2800.52, *et. seq*.]. Underwriters offers that Axon's defenses of contributory responsibility and/or sole or superseding or intervening cause for the blowout are not supported by undisputed summary judgment evidence. State differently, Underwriters claims that Axon's evidentiary claim, that Axon's "alleged" defective BOP, did not cause the blowout on the well, is unfounded.

### B. *Axon's Contentions and Assertions*

Axon asserts that the issue before the Court is whether Underwriters can avoid Walter's admission to federal agencies that the blowout occurred "because the rig crew failed to close a valve on the BOP." Axon refers to Walter's SEMS report provided to the federal government that the choke line High Closing Ration valve ("HCR") was never successfully closed. Therefore, Axon argues any "alleged defect in the BOP is immaterial because even assuming a defect in the blind shear rams, an open HCR valve or any failure of the BOP to function properly, must be seen as a "but for" cause of the blowout. Therefore, argues Axon, even if the "blind shear rams" [had closed and sealed, there was an alternative route for the gas and

particulate [to] escape, and the blowout would have continued. Axon relies on the report commissioned by Walter and provided to government concerning factors that caused or contributed to the blowout. In light of the fact that Underwriters is a subrogee of Walter, the Court looks first to the terms of the ODC and then to the SEMS report concerning liability for the blowout.

IV. **SUMMARY JUDGMENT STANDARD/ASSIGNMENT OF CLAIMS**

Summary judgment is mandated when the party against whom the motion is directed fails to show the existence of sufficient material facts establishing that an element essential to the movant's claim is disputed. FRCP, Rule 56. "[T]he nonmoving party must go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories and admissions on file' . . . show that there is no genuine issue [of a material fact] for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317; 324 (1986).

Interpretation of the terms of a contract, including an indemnity clause, is a matter of law. *Duval v. Northern Assurance Company of America,* 722 F.3d 300, 303 (5th Cir. 2013 (citation omitted)). However, a court will not construe an indemnity clause to impose liability for a loss that is not expressly nor impliedly stated in the contract. *Id.*

When a party, an assignor, assigns, its rights under a contract to an another party, an assignee, the assignee is subrogated to the rights of the assignor. *Factor King, LLC v. Block Builders, LLC, et. al*, 193 F.Supp. 3d 651, 656 (2016) (citations omitted). The rights of the assignor govern or define the rights of the assignee. *Id.* Therefore, defenses to claims that may be asserted against the assignor are enforceable against the assignee. *Id.* (citing to *Parish National Bank v. Historic Construction, Inc.,* 2002 WL 971392, 2002 U.S. App. Lexis 29391 at

4-5 (5th Cir. 2002). Stated plainly, the rights of an assignee can never exceed the rights of the assignor.

V.    **FINDING OF THE SEMS AND BSEE REPORTS**

Following the well blowout, Walter commissioned a Safety Environmental Management Systems Accident Investigation Report [SEMS] that was completed pursuant to federal regulation on August 29, 2014. *See* [30 CFR Section 250.1919]. The report addressed the nature of the incident, its escalation and loss of control, and finally centered on the cause factors for the blowout. We turn to critical portions of that report for review.

   *A.    The SEMS Report*

The SEMS report defines its scope as "describ[ing] findings that are based on the evidence examined to date and reflect[ing] the investigation's current working understanding of events leading to the blowout." It was composed of Dr. Geoffrey R. Egan, (Team Leader) Technical Director, Intertek AIM, Sunnyvale, California; Dr. Adam T. (Ted) Bourgoyne, Jr., (Lead Author) P.E., Bourgoyne Engineering LLC, Baton Rouge, Louisiana; Mr. Darryl Bourgoyne, (Lead Investigator & Secondary Author) Technical Consultant to Bourgoyne Engineering LLC, Baton Rouge, Louisiana; and Dr. Glen Stevick, (BOP Expert), Principal, Senior Mechanical Engineer, Berkeley Engineering and Research, Berkeley, California.

A major question addressed by the investigators was why activation of blind shear rams, which was the last blowout barrier in place when flow through the drillpipe could not otherwise be stopped, did not successfully control the well. The SEMS report states that the primary factors causing the escalation of the incident and loss of well control was an ineffective response to well control after the crew ignored kick detections and failed to follow well shut-in procedures. The report also concluded that activating the blind shear rams did not and could not

have established control of the well because the choke line High Closing Ratio (HCR) valve was never successfully closed. Therefore, and in light of the loss of hydraulic control pressure due to "inflow", activation of the blind shear rams may or may not have resulted in a complete closure and sealing of the blind sear rams.

In determining first causes, the investigators determined that "the first blowout barrier breached was the pressure overbalance in excess of formation pore pressure that was being provided by the completion fluid". A blowout occurs when formation fluid is allowed to enter the wellbore as it did in this incident. With the influx of formation fluids into the wellbore, a "kick", would have occurred and the wellbore fluids would kick out of the well above the rig floor. The investigators concluded that, at this stage of the blowout, a complete closure of the blind shear rams would not have stopped it. This is so because the primary cause of the escalation of the blowout was an ineffective and inept response by the crew in responding to well control complications, *i.e.,* kick detection and delayed well shut-in procedures.

In addition, the investigators concluded that the HCR valve never responded to attempts to close it. The attempt to close the HCR valve by attempting to actuate the HCR selector valve from the Toolpusher's remote panel was too late. The attempt(s) came after the accumulator pressure, and perhaps most of the pneumatic pressure, had been depleted. Therefore, the HRC selector valve did not close at the time due to the fact that the BOP components were eroded away by sand laden formation fluid. As a result, the hydraulic circuits became exposed to the blowout fluids resulting in a shutdown of the BOP system.

The investigators also found that the blind shear rams attempted to close on a tool joint. The blind shear rams are not intended to cut through a tool joint when forming an effective seal. Computer simulations performed by the investigators indicated that the blind shear rams was

capable of cutting the 3-1/2" drillpipe and a portion of the tapered wall section of the 3-1/2" drillpipe near the tool joint, but not the thickest part of a made-up tool joint.

### B. *The BSEE Panel Report (excerpts)*

The BSEE also convened a panel to investigate the well blowout on the Hercules 265. The panel submitted, in relevant part, the following Report of findings and conclusions:

> The Panel found that Walter and Hercules personnel did not calculate the density of the Zinc Bromide completion fluid used to maintain a pressure balance within the well to account for the full range of temperatures that could have been encountered within the well . . . The Panel concluded that the crew encountered temperatures higher than expected, which affected the density of the completion fluid. As a result, the completion fluid did not effectively maintain the pressure balance in the well, which resulted in the flow of hydrocarbons into the well.
>
> . . .
>
> The Panel determined that the rig-floor personnel failed to recognize signs of this "kick" in its early stages. Crew on the rig floor only became aware that the kick occurred when completion fluid began to shoot out from the open end of the annulus and drill pipe . . . The Panel concluded that the procedures in place for responding to a loss of well control were inadequate because they did not consider the potential caustic effects of the completion fluid on the crew.
>
> . . .
>
> Failure to detect the kick before its effects were seen at the surface also prevented the crew from following their established well control procedure. The force of the fluid moving out of the well was strong enough to push the drill pipe upward and into the top drive. The crew could not manipulate the drill pipe, which prevented them from installing the drill pipe safety valve and further limited their options of reestablishing control of the well.
>
> . . .
>
> The Panel found the actions to close the rams came too late; by the time the attempt to close was made, the well was already flowing at a pressure exceeding the BOP's capabilities. The flow of gas up through the well also carried sand from within the formation. This mixture of gas and sand traveling at high velocity quickly eroded the surfaces within the BOP, which would have prevented any chance of maintaining a proper seal. When the BOP stack was recovered from the rig, The (*sic*) Panel was able to document evidence of this sand cutting on the BOP.

### C. Relevant and Selected Testimonial Evidence

Following completion of the SEMS Investigation Report, the parties engaged in deposition discovery. The depositions of Dr. Adam T. ("Ted") Bourgoyne, Darryl Bourgoyne and Dexter Hicks were among those recorded. Dr. Bourgoyne was the lead author in the preparation of the SEMS Investigation Report. Darryl Bourgoyne was lead investigator and secondary author of the Report. The following excerpts of their testimony are relevant to the Court's conclusions. The excerpted portions are as follows:

### A. Excerpts from the testimony of Dexter Hicks, a Roustabout

> **Q. Did you ever -- the day that the blowout occurred, did you ever see -- did you ever see, you know, on a five-stand losses of two-plus barrels?**
> A. No, sir.
>
> **Q. On the day that the blowout occurred, if you were tripping out and you saw a two barrel loss and then shortly after that you saw a one barrel gain, in other words, you saw a switch from I'm taking losses, now all of a sudden I'm taking gains, what would you do?**
> A. If I would have detected it, I would have monitored it, shut down and monitored it.
>
> **Q. When you say "shut down," what do you mean?**
> A. Stop pipe movement.
>
> **Q. And would you have done a flow check?**
> A. I would have left my trip tank on.
>
> **Q. If you would have seen a change where you were taking losses but then you switched to a gain, would that have led you to do a flow check?**
> A. If it's detected. If I would've detected a two barrel gain -- or losses and then again, a one barrel gain, I would've stopped pipe movement and lined up the circle and monitored it on my trip tank, my gains and losses visually.
>
> **Q. Would you have stopped all movement and monitored it for at least ten minutes?**
> A. Yes.

[p. 112, ll. 20 through p. 113, l. 22]

> Q. Well, you told me -- hold on. You told me a moment ago that you lowered down, and they set the slips, and at that point you saw fluid coming out. So before they tried to stab the TIW, you had already closed the annular. That's what you said a minute ago. Do you remember that?
>
> A. Yes.
>
> Q. And the Hydril, that's the same thing as the annular, right?
>
> A. Yes, sir.
>
> Q. So before you tried to raise up the block, you had already closed the annular, because that fluid was coming out and you had to stop it from getting on your guys?
>
> A. Yes, sir.
>
> Q. So you've got your annular closed. You then try to lift up and it doesn't work. What do you do next?
>
> A. By that time, the toolpusher is on the floor, and he asked have I tried the TIW, and I told him, "No, sir. And he said, "What you got closed?" And I told him, "I've got the Hydril closed." He said, "Why didn't you get the TIW in it?" I told him, "Because the force of the pipe was pushing up against the top drive, so the higher I pick up, the higher it come up." He said, "Well, we'll go down to the toolpusher's officer and run everything from down here."

[p. 162, l. 3 through p. 163, l. 9.]

> Q. Now, my understanding of our discussion was that if you closed the annular and you closed the HCR and you still hadn't controlled the well that the next thing you would do is hit the blind shear?
>
> . . .
>
> A. You want to know what steps I would close the BOPs on the pipe?

[p. 249, ll. 5-9, 21, 22]

> Q. The TIW is not stabbed. We're going back to the same old -- the same situation you had out there in 2013. You can't stab the TIW, --
>
> A. Yes.
>
> Q. -- and you closed the annular. That's exactly what happened the day of the incident, correct?
>
> A. Yes, sir.

Q. Now, here's where we're getting the hypothetical in. We're saying you're the one out there, the only one out there. You're not talking with Mr. Nuckles. You're not talking with the company man. If the annular didn't fix it, and we know it didn't fix it that day, is the next thing you would do --
A. Close the pipe ram.

Q. I'm sorry?
A. Close the pipe ram.

Q. What about the --
A. I mean, close the blind rams.

[p. 250-, ll. 2-22]

Q. So the steps are you'd close the annular, step one; step two, close the HCR; if no relief, step three, blind shear, correct?
A. Yes.

Q. Okay. Now, why would you close the HCR?
A. To keep fluid from coming up. We was trying to get it to where we could get to the rotary at that time.

[p. 251, ll. 2-9]

Q. Okay. Do you recall prior to the incident the hole ever gaining?
A. No, sir.

[p. 252, ll. 20-22]

**B. Excerpts From the Testimony of Adam T. "Ted" Bourgoyne, Lead Author the SEMS Report.**

Q. . . . "The first indication of a kick occurred when tripping operations were stopped for about seven minutes to change out pipe handling equipment and a one-barrel gain in trip tank volume was recorded. Actions were not taken to shut in the well until 18 minutes later when the well began flowing out of the drillpipe." That's a conclusion you reach in this report, right?
A. That's a conclusion that I had.

. . .

> Q. In the – I think I've read some earlier testimony of yours where you said again in a trip tank is a red light, though, right?
>
> A. Yeah, again – a pit gain is a red light, that's right.
>
> Q. That's something you teach your students?
>
> A. Yes.

[p. 74, ll. 11-18, 23 through p. 75, l-4]

> Q. Well, then a -- but ten minutes later it showed a one-barrel gain over the course of one minute, didn't it?
>
> A. The warning signs got progressively – the yellow light got progressively brighter as time went on, yes.

[p. 77, ll. 17-22]

> Q. So they didn't notice the kick until it's shooting out of the rotary table, right?
>
> A. Until it's raining on their head.
>
> Q. And that's what they said on their statements, too?
>
> A. Yes.
>
> Q. And at that point, that's -- that's a kick, right?
>
> A. That's a kick.
>
> Q. You know there was a kick?
>
> A. Everybody knew it was a kick at that point.
>
> . . .
>
> Q. (BY MR. HENKEL) No, I -- I enjoyed hearing your son talk. I couldn't help it. That's the last possible time they could have detected it, isn't it? I mean, other -- to detect it any later, you --
>
> A. When it was coming out of the top of the drill pipe?
>
> Q. Right.
>
> A. I mean, it's obvious to everybody at that point.

[p. 101, ll. 4-14, l. 25 through p. 102, l. 7.]

> Q. Did you find anywhere in the witness statements where one of the crew members attempted to close the HCR valve?
>
> A. Not as we sit here today, I don't recall.
>
> . . .

Q. There on No. 4 where it's talking about the driller, do you see that?
A. Yes.

Q. "Open HCR valve," correct?
A. Yes.

Q. All right. And when you found the HCR valve, what position was it in?
A. It was open.

. . .

Q. Do you see there where it says the driller nearly simultaneously opened the HCR valve?
A. Yes. Now, that -- that's an interpretation of mine --

Q. Okay.
A. -- based on the records.

Q. So the drill -- from your interpretation of reviewing the records, the driller opened the HCR valve?
A. Yes.

Q. Okay. From that point on, do you see anywhere in your timeline where there is an attempt to close the HCR valve?
A. No, but I think we -- we did -- we did state in the -- in the body of the report that it made sense that they would have attempted to close it before abandoning the rig, from the remote station.

[p. 142, ll. 13-16; p. 143, ll. 5-14; p. 144, ll. 7-22]

### C. Excerpts from the Testimony of Darryl Bourgoyne, Lead Investigator and Secondary Author SEMS Report.

Q. And exhibit -- and in Exhibit 18, the blind shear rams are closed?
A. That's correct.
Q. And in Exhibit 18, the HCR valve is open, correct?
A. That's correct.
Q. This illustrates that the HCR valve is below the blind shear rams?
A. That's correct.
Q. And that's -- that was the setup in the BOP?
A. Yes.

[p. 204, ll. 12-22]

    Q. . . . Exhibit 18 demonstrates the basic fact that if the blind shear rams are closed and sealing, but the HCR valve is open, that the well can still unload through the HCR valve and the choke line?

    A. Yes, that shows that if a seal is established with the blind shear rams, the well is still going to blow out or flow through the -- through the choke system.

    . . .

    Q. The blind -- Exhibit 18 shows us that the blind shear rams cannot stop a blowout when the HCR valve is open.

    A. I agree with that.

[p. 205, ll. 13-20; p. 206, ll. 4-7]

    Q. So you concluded and Dr. Bourgoyne concluded that the well was flowing and that a barrel of fluid from the well -- a barrel of fluid had entered the well and caused a barrel of fluid, an extra one to go into the trip tank?

    A. That's the cause of that barrel increase.

    Q. This is a sign of an ongoing kick?

    A. Yes.

[p. 212, ll. 4-11]

    Q. This -- this equipment had the capability, if someone was watching, to identify a one-barrel gain of fluid?

    A. That's the -- that's the point I want – not all equipment has that capability is the point I wanted to make.

    Q. In this specific case, the equipment on the 265 had the capability of identifying a one-barrel gain of fluid?

    A. With the trip -- the trip tank had -- yeah, the equipment in use, you can look at the data record and -- and make that determination.

    Q. Right. So the Hercules rig crew had appropriate equipment that could identify a one-barrel gain in the trip tank --

    Q. (BY MR. BARROW) -- true?

    A. With the pipe stationary, true.

[p. 214, l. 17 through p. 215, l. 9]

Q. And you found that, for a second time starting at 8:31, there was no movement of the block and there was a larger gain, there was a 1.3-barrel gain. Do you see that?

A. And I see the gain on the curve, yes.

Q. And what you're -- what you're looking at is you're looking at the gain -- the red curve, which is the trip tank?

A. That's correct.

Q. And so in this instance, this is a bigger gain in a much shorter period of time?

A. It's about the same size gain, but it's -- it's a shorter per- -- significantly shorter period of time.

Q. It -- the -- the gain is 30 percent larger because it's 1.3 barrels?

A. Yeah, you know, I -- I look at this trip tank setup. Its -- its resolution is about .1, .2 barrels. So this one's larger, but the resolution, you know, is -- is not perfect, so you got to take that in – so it's a similar size. But the most significant part is it occurred quicker.

Q. So if -- if this instance would have – you know, if that one minute would have been stretched out to seven minutes, we're looking at over a 20-barrel gain at this rate?

A. If the 1.3 -- if you just take it at face value, yes.

Q. (BY MR. BARROW) And -- and you -- it might have been, actually, Dwayne who did this, but the SEMS team studied this and found that the rate of the influx of the fluid into the well was a parabolic rate that increased over time?

A. Parabolic or exponential, I don't know the best way to describe it, but --

Q. Let's --

A. -- the rate was going to -- was going to keep increasing, not -- it's not the -- the rate was not constant, by any means.

Q. It wasn't a linear rate, where one minute, one barrel; two minutes, two barrels; it was one minute, one barrel; two minutes --

A. Five barrels.

Q. -- three minutes, 25 barrels?

A. That concept.

Q. And Exhibit 21 is a more serious indication of a kick going on starting at 8:31?

A. It -- it's much -- it's serious -- it's getting more substantial. It's -- it's much -- it's more significant.

> Q. And that's because with no block movement, you have a 1.3-barrel gain in a much shorter period of time, only a minute?
> A. Yes.
>
> Q. And if -- if -- if the well is gaining fluid during this period of time, it's gaining fluid from 8:20 through 8:31?
> A. Formation -- it's gaining formation fluids. I...
>
> Q. If a rig crew sees -- well, the rig crew on the -- on the Hercules 265 had equipment that would allow them to see a 1-barrel gain over one minute?
> A. Yes.
>
> Q. And that is a serious indication of a kick that needs to be investigated?
> A. If it's – if – if it's appreciated, yes that needs to be investigated.
>
> Q. And the equipment was such on the rig that if you were watching the equipment, you could see there is a 1.3 barrel gain in only one minute?
> A. There – you know, anything they can – that I'm aware of that can create a record like this, an electronic record, has monitors for the rig crew to use.
>
> Q. And upon de—so the right thing to do is, No. 1, to be monitoring, right?
>
> Q. (BY MR. BARROW) And if you're monitoring and you see this, the right thing to do is to stop what you're doing and investigate?
> A. That's correct.

[p. 216, l. 11 through p. 219, l. 17].

## VI. DISCUSSION AND ANALYSIS

Underwriters disputes that Axon is a contractor or subcontractor within the meaning of the Offshore Drilling Contract ("ODC") between Walter and Hercules. *See* [DE# 249, ODC]. This dispute is unmeritorious.[4] The ODC states that Walter, as operator, assumes all obligations and "shall be solely responsible and assumes liability for all consequences of operations" including Hercules' subcontractors on any theory of law including strict liability. *Id.* at [Art. V]. Therefore, Walter disputes that Axon was a subcontractor to Hercules. This objection, too, is

---

[4] "A maritime contract containing an indemnity agreement, whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Becker v. Tidewater, Inc.,* 586 F.3d 358, 369 (5th Cir. 2009) (quoting *Weathersby v. Conoco Coil Co.,* 752 F.2d 9 53, 955 (5th Cir. 1984)).

unmeritorious. The repairs and/or installations on the Hercules 265 platform were an integral part of the drill operations.[5] Therefore, Axon is a subcontractor contemplated under the terms of the ODC.

Underwriters next argues or suggests that its suit against Axon was not brought under common law negligence but under the Louisiana Products Liability Act ("LPLA"). *See* [La. Rev. Statutes Title 9, Chapt. 3 § 2800.53 (1988)]. Therefore, any settlement(s) between Walter and Underwriters is not a bar to a suit by Underwriters as subrogee to Walter against Axon based in strict liability. This assertion fails on two accounts. First, the ODC indemnifies Hercules even if the events cause is based in strict liability. *See* [DE# 249, Article V; Article IX, 901(a), (c); § 911(a) and (b)]. Therefore, Underwriters decision not to attribute fault of the well blowout to Walter does not mean that Walter and Underwriters are no longer bound by the terms of the ODC and case law.

The Louisiana Statute, the LPLA, provision provides that LPLA is the exclusive remedy against a manufacturer for damages caused by its product. This statute is inapplicable because there is no evidence indicating that the blind shear ram or any other part associated with the BOP, was "a" or "the" proximate cause of the well blowout. To establish proximate cause, Underwriters must show that Axon's manufactured parts were unreasonably dangers because of construction, composition, or design that Axon failed to give adequate warning; or because the parts were noncomforming to an express warranty. *See* La Statutes Ann. Title 9, Chapter 3 § 2800.54(B)(1-4); *see also Parra v. Coloplast Corp.,* [2017 WL 24794, ED La (2017)].

---

[5] Walter expressly agreed to be "responsible for and hold harmless and indemnify [Hercules] and its suppliers, contractors and subcontractors of any tier. This type of provision establishes that a supplier, contractor or subcontractor of Hercules "is undisputedly an indemnitee" under the ODC. *Breaux v. Halliburton Energy Services*, 562 F.3d 358, 361-66 (5th Cir. 2009) (holding party had "express notice" of its indemnity obligation to subcontractor where agreement required indemnification of other contracting party "and its contractors and subcontractor(s) of any tier"); *see also Sumrall v. Ensco Offshore Co.,* 291 F.3d 316, 320 (5th Cir. 2002) (holding provision providing for indemnity of rig operator and its contractors and subcontractors "expressly indicates [the indemnitor]'s intent to indemnify not only [the operator], but also [the operator]'s 'contractors and subcontractors.

Underwriters has not presented evidence establishing that the parts supplied by Axon were defective and/or nonconforming. In fact, arguments along these lines are mere speculation. An inspection of the condition of the recovered parts teaches that it was impossible to recreate the conditions surrounding the blowout. Therefore, no testing was possible. Moreover, the best minds, including Walter's experts, determined the cause of the blowout and stated same in the SEMS and BSEE Reports. In the absence of scientific evidence that the BOP and/or blind shear ram would not, under proper measures, have performed as intended, undermines Underwriters' strict liability claim(s). The evidence is undisputed that Walter's crew failure to follow proper procedures for shutting in the well. All of the evidence, scientific and otherwise, points to human error and not otherwise. Accordingly, the Court HOLDS that Underwriters pleadings and proffers of evidence fail to meet the requisite pleading standard to establish proximate cause. *Hutto v. McNeil-PPC, Inc.,* 2011-609 La App. 3 Cir. 12/7/11, 17-18; (79 So. 3d 1199, 1213 *writ denied*).

Finally, Underwriters' claims against Axon are barred by the fact that Underwriters can no longer seek recovery against Walter having settled their claim(s) between themselves. Nothing remains to be litigated. *See King LLC,* 193 F.Supp. 3 at 656. As stated earlier, Axon is a subcontractor of Walter and is entitled to the protection from suits by Walter and others pursuant to the ODC between Walter and Hercules. Therefore, Axon is entitled to indemnity from Walter for any liability to which Axon might be exposed and related to the incident that occurred on the Hercules 265 on July 23, 2013. *See* [DE 249, Exh. A: §§ 902, 905, 907 and 911].

The Court GRANTS Axon's motion(s) for summary judgment and DISMISSES Underwriters and Walter's suit with prejudice. After attorneys' fee and costs calculations, the Court shall enter a Final Judgment.

It is so Ordered.

SIGNED on this 23rd day of February, 2018.

_____
Kenneth M. Hoyt
United States District Judge